# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| ROBERT SLINKARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   **Case No. 4:15cv0237 TCM** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (the Commissioner), denying Robert Slinkard's applications for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b. All matters are pending before the undersigned United States Magistrate Judge with consent of the parties pursuant to 28 U.S.C. § 636(c).

## Procedural History

Robert Slinkard (Plaintiff) applied for DIB and SSI in September 2011, alleging that he became disabled on the fifth of that month because of a neck fusion, degenerative disc disease, numbness in his left arm, problems with his left shoulder, sleep apnea, gastroesophageal reflux disease (GERD), spinal stenosis, breathing problems, carpal tunnel syndrome, and an inability to handle loud noises. (R.[1] at 123-38, 171.) His applications were denied initially and after

---

[1] References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

a hearing held in July 2013 before Administrative Law Judge (ALJ) Jhane Pappenfus.  (<u>Id.</u> at 8-22, 27-65, 73-81, 119.)  After reviewing additional evidence, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby adopting her decision as the final decision of the Commissioner.  (<u>Id.</u> at 1-5.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Delores E. Gonzalez, M.Ed., testified at the hearing.

Plaintiff testified that he is 6 feet 3 inches tall and weighs 350 pounds.  (<u>Id.</u> at 39.)  His weight has increased due to the steroids he is taking.  (<u>Id.</u>)  He lives with his wife and eighteen-year old daughter.  (<u>Id.</u> at 47.)  His wife works.  (<u>Id.</u>)

Asked about how his neck was after a September 2011 operation, Plaintiff testified that he has throbbing, excruciating pain that radiates to his arms and down his back to his legs.  (<u>Id.</u> at 38.)  This happens once or twice an hour.  (<u>Id.</u>)  Plaintiff has low back pain.  (<u>Id.</u> at 39.)  The pain shoots down his right leg when he walks and causes that leg to occasionally drag.  (<u>Id.</u>)  He has breathing problems and was hospitalized in 2011 with chronic obstructive pulmonary disease (COPD).  (<u>Id.</u> at 40.)  He uses a nebulizer four times a day and carries an inhaler.  (<u>Id.</u>)  He has problems when in hot, humid areas.  (<u>Id.</u>)  Also, Plaintiff has sleep apnea.  (<u>Id.</u>)  At night, he uses a continuous positive airway pressure (CPAP) machine and humidifier.  (<u>Id.</u>)  He has a tear in his left rotator cuff and a torn tendon in his bicep.  (<u>Id.</u> at 41.)  He is right hand dominate.  (<u>Id.</u>)  He had surgery in 2007 for bilateral carpal tunnel syndrome, but the problem has reoccurred.  (<u>Id.</u> at 42.)  A nerve conduction study is scheduled for the next month.  (<u>Id.</u> at 43.)

In addition to the weight gain, side effects from his medications include fatigue if he is in hot weather, dizziness, and nausea.  (Id. at 46.)

Plaintiff further testified that he has problems keeping his hold on things, e.g., cups, and manipulating small items.  (Id. at 44.)  He has difficulties with buttons.  (Id.)  He can shave himself, but cannot use a keyboard because his hands go numb.  (Id. at 45.)

He is unable to mow his yard.  (Id. at 47.)  He tried to use a weed eater in 2012, but the vibrations caused his arms to go numb.  (Id. at 47-48.)  He uses a dust mop on the hardwood floors once a week for three minutes because the vibrations from the vacuum cause his arms to go numb.  (Id. at 48.)  His daughter washes the dishes.  (Id.)  The only meals he prepares are microwavable ones.  (Id.)  He uses an electric cart when he goes grocery shopping.  (Id. at 50.)

Plaintiff goes to VFW monthly meetings to socialize.  (Id. at 51.)

Plaintiff cannot stand for longer than twenty minutes before having to change positions.  (Id. at 52.)  He cannot walk farther than forty yards before his back starts hurting.  (Id. at 53.)  He cannot sit for longer than ten minutes before having to change positions because his tailbone and legs go numb.  (Id.)  For a short time, he can reach in front of him.  (Id. at 54.)  Consistently, he can lift five pounds with his right arm.  (Id. at 55.)  Occasionally, he can lift ten to fifteen pounds.  (Id.)

Ms. Gonzalez, testifying as a vocational expert, was asked by the ALJ to assume an individual with Plaintiff's age (then 45), education, training, and work experience who can perform light work with additional limitations of never climbing ropes, ladders, and scaffolds; avoiding  hazardous heights and airborne irritants; and only occasionally pushing and pulling

with his left upper extremity.  (Id. at 60.)  Ms. Gonzalez testified that this claimant can perform the work of a mail sorter, marker, or furniture rental consultant.  (Id. at 61.)

A hypothetical individual limited to sitting no longer than twenty to thirty minutes at a time before having to stand for five to ten minutes, to standing for no longer than ten or fifteen minutes at one time, to walking no farther than fifty yards, to reaching no more than occasionally, to lifting no more than ten to fifteen pounds with his dominate right upper extremity, and to only occasionally gripping, grasping, and feeling can perform work as a surveillance system monitor.  (Id. at 62-64.)  If the individual will miss two or more days of work a month due to his impairments, he will not be able to sustain employment.  (Id. at 65.)

Asked if there is a conflict between her testimony and the *Dictionary of Occupational Titles* or *Selected Characteristics of Occupations*, Ms. Gonzalez replied that there was not. (Id. at 61.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included documents generated pursuant to Plaintiff's applications, records from health care providers, and various assessments of his mental or physical capabilities.

On a Disability Report, Plaintiff disclosed that he is 6 feet 1 inch tall and weighs 317 pounds.  (Id. at 171.)  He stopped working on September 5, 2011, when he was laid off due to his medical condition and the lack of light duty work.  (Id.)  He graduated from high school and has competed training in hotel and restaurant management.  (Id. at 172.)

On a Function Report, Plaintiff disclosed that he attempts to do chores during the day, but has to take breaks due to pain.  (Id. at 188.)  He cooks meals for his family.  (Id.)  Pain

causes him to wake up during the night.  (Id. at 189.)  How often it takes him to prepare a meal depends on if he is able to stand, if his hands cramp, and if his neck hurts.  (Id. at 190.)  He does household chores, e.g., cleaning the bathroom, mowing, and laundry.  (Id.)  He spaces them out throughout the day.  (Id.)  His impairments adversely affect all his abilities, including, but not limited to, talking, getting along with others, walking, standing, sitting, following instructions, seeing, remembering, and concentrating.  (Id. at 193.)  He has to read written instructions over a few times in order to understand them.  (Id.)

On another Function Report completed three months later, Plaintiff reported that he does not do any cooking unless he makes a sandwich or microwaves a meal.  (Id. at 205.)  His family does all the chores.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological order beginning with a January 2010 sleep study revealing moderate to severe obstructive sleep apnea.  (Id. at 608-09.)  It was recommended that Plaintiff use a CPAP machine and participate in a medically-supervised weight loss program.  (Id.)

In November, Plaintiff went to the emergency room at Missouri Baptist Sullivan Hospital for complaints of shortness of breath that had begun two days earlier.  (Id. at 240-49, 266-94.)  A chest x-ray showed minor patchy parenchymal disease in the bilateral infrahilar regions, but was otherwise negative.  (Id. at 248.)  An electrocardiogram (EKG) was normal.  (Id. at 292.)  Plaintiff was diagnosed with acute bronchitis.  (Id. at 282.)  He was administered intravenously Medrol and Levaquin and given a dose of albuterol.  (Id. at 245, 270.)  On discharge, he was given prescriptions for albuterol (a bronchodilator), prednisone (a

corticosteroid), and Vicodin (a combination of acetaminophen and hydrocodone, an opioid pain medication). (Id. at 245, 271.)

Two weeks later, Plaintiff consulted Matthew Tiefenbrunn, M.D., for a follow-up for his bronchitis. (Id. at 353-56.) He reported that he was trying to cut down on smoking. (Id. at 353.) He had lost approximately thirty-five pounds over the past six months through better diet and increased exercise. (Id.) On examination, Plaintiff had a cough, wheezing, sputum, and pleuritic pain. (Id. at 354-55.) His extremities appeared normal, as did his gait and insight. (Id. at 355.) He was prescribed Advair Diskus (prescribed to prevent flare-ups of COPD) and omeprazole (a proton pump inhibitor prescribed to treat GERD). (Id. at 356.)

A few days later, Plaintiff had an echocardiogram (ECG), revealing an estimated ejection fraction of 60 percent in his left ventricle, mild left ventricular hypertrophy, and impaired relaxation. (Id. at 382-83) The ECG was otherwise normal. (Id. at 383.) His results on a spirometery indicated a moderate risk for COPD unless he quit smoking; if he did, the risk was low. (Id. at 384-87.)

Lab work done in December revealed high cholesterol. (Id. at 393-94.)

In January 2011, Plaintiff saw Dr. Tiefenbrunn about pain in his left shoulder joint and region and decreased strength in the past few months. (Id. at 359-60.) X-rays of his left shoulder were within normal limits. (Id. at 375.) Plaintiff was given a steroid injection and prescribed diclofenac (a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain caused by osteoarthritis or rheumatoid arthritis). (Id. at 359.) He was to have a magnetic resonance imaging (MRI) if the shoulder did not improve. (Id.)

Plaintiff returned to Dr. Tiefenbrunn in May with complaints of numbness in both forearms and persistent left shoulder pain. (Id. at 361-65.) Also, he felt like his carpal tunnel problems were reappearing. (Id. at 361.) He was short of breath, although he had stopped smoking in January. (Id.) He wanted to discuss weight loss. (Id.) His neck was stiff. (Id. at 363.) On examination, he had muscle spasms in his cervical spine and mild pain with movement. (Id. at 364.) Phentermine (a stimulant used to treat obesity) and nabumetone (an NSAID used to relieve the symptoms of osteoarthritis or rheumatoid arthritis) were added to his prescriptions. (Id.) A cervical spine MRI and x-rays and a nerve conduction study were ordered. (Id.) The X-rays were taken the same day, revealing no acute fracture or subluxation, but mild, diffuse degenerative disc disease that was pronounced at C4-C5 and C5-C6. (Id. at 376-77.)

The following month, Plaintiff had the MRI. This showed a central and left-sided C4-C5 disc bugle with spinal cord deformity; central and left-sided C5-C6 disc herniation associated with severe stenosis; central and right-sided C6-C7 disc protrusion; and possible signal change at T2. (Id. at 321-22, 371-72.) An MRI of his left shoulder showed mild osteoarthritis with impingement on the rotator cuff; marked supraspinatus, mild infraspinatus, and moderate subscapularis tendinopathy; small supraspinatus and infraspinatus rim rent tears; marked intra-articular biceps tendinopathy; probable biceps longitudinal split at bicipital groove; probable normal variation of posterior labrum; small humeral head cysts; and minimal shoulder effusion and subacromial bursitis. (Id. at 373-74.) An ECG showed no evidence of ischemia during the maximum exercise stress test and revealed normal rest and exercise myocardial perfusion images. (Id. at 378-81.) The previous findings of an estimated ejection

fraction of 60 percent in his left ventricle, mild left ventricular hypertrophy, and impaired relaxation were unchanged. (Id. at 380.) A saline contrast study was recommended to further investigate what appeared to be a small atrial septal defect. (Id.) An electromyogram (EMG) and nerve conduction study indicated moderate bilateral carpal tunnel syndrome. (Id. at 388-92.)

Plaintiff consulted Andrew S. Youkilis, M.D., in July about his neck pain and bilateral weakness and tingling in his upper extremity that he described as having started eight years earlier and as worsening in the past two years. (Id. at 300-03, 319-20, 324-27.) Plaintiff reported that he became dizzy when looking up. (Id. at 300.) Also, he had headaches, his hands were clumsy, and his right leg dragged. (Id.) He had obstructive sleep apnea, and consistently used his CPAP machine. (Id.) He worked as a maintenance man. (Id. at 301.) On examination, Plaintiff had a steady gait and did not favor either lower extremity. (Id.) His Tandem gait was normal. (Id.) He was steady when he stood. (Id.) His strength was 5/5 in his upper extremities with the exception of being 5-/5 in his left biceps. (Id. at 302.) Having reviewed the May x-rays and June MRIs, Dr. Youkilis recommended a C5-C6 anterior cervical discectomy and fusion,[2] allograft,[3] and anterior plate. (Id. at 303.)

---

[2]An anterior cervical discectomy and fusion is the removal of a cervical herniated disc through the front of the neck to relieve spinal cord or nerve root pressure. Peter F. Ullrich, Jr. M.D., ACDF: Anterior Cervical Discectomy and Fusion, http://www.spine-health.com/treatment/spinal-fusion/acdf-anterior-cervical-discectomy-and-fusion (last visited Nov. 5, 2015).

[3]An allograft is "[a] tissue graft from a donor of the same species as the recipient but not genetically identical." Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/allograft (last visited Nov. 5, 2015).

Before undergoing that procedure, Plaintiff had a pre-operative clearance examination by Dr. Tiefenbrunn. (Id. at 366-70.) He was started on lisinopril (used to treat hypertension) due to elevated blood pressure. (Id. at 366.) Diet, exercise, and weight management were discussed. (Id.) An injection of corticosteroids to relieve his rotator cuff pain was discussed. (Id.) Physical therapy or additional imaging studies would be considered if there was no improvement. (Id.) In addition to the lisinopril, his prescriptions included nabumetone, omeprazole, simvastatin (used to lower cholesterol), and tramadol (a narcotic-like pain reliever). (Id. at 369.)

On September 13, Dr. Youkilis performed the discectomy and fusion. (Id. at 304-11, 316-18.)

The following month, on October 10, Plaintiff reported to Dr. Youkilis that he felt his left hand strength was improving, but he had some numbness around the left shoulder blade, pain in his left shoulder, and pain in his neck that radiated to the base of his skull. (Id. at 328-29.) A cervical spine x-ray showed satisfactory alignment of anterior plate and screws with bone graft at disc space status post fusion at C5-C6. (Id. at 298, 323.) On examination, Plaintiff's strength was grossly intact with the exception of 5-/5 in his left hand; Tinel's sign was negative at the left wrist[4]; there was a decreased range of motion in his left shoulder; and there was decreased sensation in a left ulnar distribution and in his left pointer finger. (Id. at 328.) Dr. Youkilis recommended Plaintiff wean himself from the cervical collar and from the

---

[4]Tinel's test is used in the diagnosis of carpal tunnel syndrome. See Jonathan Cluett, M.D., Carpal Tunnel Syndrome http://orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel (last visited Nov. 5, 2015). A Tinel's sign is present when tingling in the fingers is made worse by tapping the median nerve along its course in the wrist. Id.

Valium.  (Id.)  Plaintiff could return to work with a twenty-pound weight lifting restriction and minimal overhead work.  (Id.)  Plaintiff was to be referred for an orthopedic consultation about his possible rotator cuff tear.  (Id.)

Later that month, Plaintiff consulted Dr. Tiefenbrunn about neck pain that had been increasing in intensity since his fusion.  (Id. at 342-45.)  Tramadol was not helping, and Dr. Youkilis had refused to authorize additional refills.  (Id. at 342.)  His symptoms also included loss of balance and "'seeing stars' when looking up."  (Id.)  Plaintiff was given prescriptions for Flexeril (a muscle relaxant), lisinopril, nabumetone, prednisone, omeprazole, simvastatin, and Tylenol with codeine.   (Id. at 345.)

On December 19, Plaintiff complained to Dr. Tiefenbrunn about shortness of breath and shoulder pain.  (Id. at 346-50.)  The nabumetone and Tylenol with codeine had provided little relief.  (Id. at 346.)  A review of his symptoms was negative for cold or heat intolerance, anxiety, psychiatric symptoms, gait disturbance, and muscle weakness and myalgia.  (Id. at 348-49.)  It was positive for back pain, bone/joint symptoms, and neck stiffness.  (Id. at 349.)  He was not in acute distress and had a normal respiratory effort.  (Id.)  His extremities appeared normal.  (Id.)  His prescriptions, including Advair Diskus and albuterol, were renewed.  (Id.)

Plaintiff saw Todd D. Bailey, M.D., with Pain Management Services on December 30.  (Id. at 337-40.)  Plaintiff described his pain as beginning explosively the year before and radiating from the neck and shoulders to the head.  (Id. at 337.)  It was severe and easily aggravated.  (Id.)  His past medical history included headaches, migraines, chronic bronchitis, and post-traumatic stress disorder.  (Id.)  Plaintiff was currently unemployed.  (Id. at 338.)  Plaintiff was 6 feet 2 inches tall and weighed 350 pounds.  (Id.)  On examination, Plaintiff had

no significant pain to palpation over the posterior cervical neck or intrascapular muscles. (Id. at 339.) He did have pain to palpation over this right lower facet joints; the pain was worse with lumbar extension. (Id.) His affect and mood were normal. (Id.) Plaintiff was diagnosed with failed neck surgery syndrome/cervical spondylosis and with lumbago. (Id.) He was given a prescription for tramadol and Neurontin (a brand name for gabapentin, used to teat nerve pain), for physical therapy for his neck, and for lumbosacral x-rays. (Id. at 340.) He was to return in one month. (Id.)

The x-rays showed no acute fracture or subluxation; moderate degenerative disc disease at L2-L3 and L5-S1; mild diffuse degenerative disc disease at other levels; and mild to moderate rotatory dextroscoliosis. (Id. at 351.)

Plaintiff was seen by Kerri Wallace, M.P.T., on January 11, 2012, reporting he had been laid off from his job as a heavy equipment operator because of his medical problems. (Id. at 397-98, 444.) He could tolerate no more than two hours of outdoor work at home before having to stop and rest. (Id. at 397.) When evaluated, Plaintiff had a decreased range of motion in his upper extremity. (Id. at 97-98.) He was to participate in physical therapy two to three times a week for four weeks. (Id. at 398.)

On January 27, Plaintiff again consulted Dr. Bailey about his shoulder, neck, and back pain. (Id. at 410-11.) He described the pain as "shooting, throbbing, dull, aching, sharp, electric shock, burning, tolerable." (Id. at 410.) It was also intermittent. (Id.) Plaintiff reported that physical therapy had helped with his range of motion, but not his pain. (Id. at 411.) His Neurontin dosage was increased, and a refill for tramadol was issued. (Id.) His diagnoses were unchanged. (Id.)

Three days later, Plaintiff was seen at the Veterans Administration Medical Center (VA) in Columbia, Missouri, (Id. at 431-35.) He reported that medications and physical therapy had not helped with his left shoulder problem and requested an orthopedic referral. (Id. at 434, 437.) He was to be evaluated for a suspected left rotator cuff tear. (Id.) He was advised to avoid pushing a wheelbarrow and cutting wood. (Id. at 439.) He declined the suggestion he consult a dietician or enroll in an exercise class. (Id.) It was recommended he count calories and walk between thirty and sixty minutes a day on level ground. (Id.) Plaintiff later cancelled the appointment after finding a provider closer to his home. (Id. at 435.)

Also at the VA that day, Plaintiff was fitted for a CPAP machine and seen for a routine follow-up of Barrett's esophagus. (Id. at 435-36, 619-22.)

Four days before his VA appointment, on January 26, Plaintiff had his sixth physical therapy session. (Id. at 446.) The mobility in his neck and shoulders was improving, but the pain was not. (Id.) Plaintiff had his eleventh visit on February 13. (Id. at 447.) He was doing his home exercises twice a day, but was continuing to have pain. (Id.) Ms. Wallace noted that Plaintiff had demonstrated little to no progress on his cervical range of motion, but had made some progress on his left upper extremity range. (Id.) She further noted that the potential for further physical therapy was guarded. (Id.)

On February 24, Plaintiff had a follow-up appointment with Dr. Tiefenbrunn. (Id. at 543-47.) His hypertension was controlled; his hyperlipidemia was acute; his degenerative disc disease was symptomatic; his morbid obesity was poorly controlled; his obstructive sleep apnea was fairly controlled; and his wheezing was recurrent. (Id. at 543.) Chest x-rays showed no acute cardiopulmonary disease. (Id. at 569.) A computed tomography (CT) scan of his

chest was scheduled and Plaintiff was referred to a pulmonologist, Adeel Khan, M.D.  (Id. at 546.)

Plaintiff had a lumbosacral MRI on March 2, revealing moderate to severe facet arthropathy at L4-L5 with ligamentum hypertrophy, triangulation of the spinal canal, and moderate bilateral foraminal stenosis.  (413, 567-68.)  At L5-S1, there was posterior broad based disc protrusion, a possible small annular tear, mild to moderate facet arthropathy, and moderate bilateral foraminal stenosis.  (Id. at 413.)  A CT scan of his chest revealed minimal interstitial lung diseases in the anterior aspects of both upper lobes/lingula and medial segment of the middle lobe; focal bronchiolectasis in the anterior segment of the right upper lobe; minimal ectasia of the ascending thoracic aorta; mild left ventricular wall hypertrophy; and diffuse hepatic steatosis.  (Id. at 514-15.)

Plaintiff met with Dr. Khan again on March 7.  (Id. at 508-13.)  Addressing his GERD, Dr. Kahn recommended he use a proton pump inhibitor, not eat four hours before bedtime, frequently eat small meals, and avoid fatty meals.  (Id. at 508.)  Sleep hygiene practices were discussed.  (Id.)  Weight loss and surgical treatments for obesity were also discussed.  (Id.)  Plaintiff wanted to lose weight on his own.  (Id.)  Plaintiff complained of shortness of breath on exercise and wheezing when walking fifty to one hundred yards on level ground.  (Id. at 509.)  Dr. Khan noted that he was on his second canister of albuterol since January of that year.  (Id.)  On examination, Plaintiff's gait and extremities were normal.  (Id. at 513.)  He was oriented to place, person, time, and situation.  (Id.)  His breath sounds were equal and without wheezes, rales, or rhonchi.  (Id.)

On March 20, Plaintiff saw Dr. Bailey again. (Id. at 412-13.) His pain was described as before with the exception it was now constant. (Id. at 412-13.) He reported that the medications had provided 30 percent relief. (Id. at 412.) Based on the MRI findings, Plaintiff was to receive a right L4 and L5 selective epidural steroid injection. (Id. at 413.) Right lower extremity radicular symptoms were added to his diagnoses. (Id.)

Three days later, Plaintiff saw Dr. Khan for a follow-up for his asthma. (Id. at 503-07, 521-24.) Pulmonary function tests were given and the results were discussed. (Id. at 503, 521-24.) The tests results suggested a mild obstructive ventilatory impairment with significant improvement after bronchodilators and air trapping. (Id. at 521.) Plaintiff was continued on Advair and albuterol, the latter to be taken as needed. (Id. at 503.) Plaintiff was shown the proper technique for using inhaler medications. (Id.) At Plaintiff's request, the titration on his CPAP machine was checked and sleep hygiene practices were again discussed. (Id.) As before, Plaintiff wanted to lose weight on his own. (Id.) Dr. Khan noted that changes on Plaintiff's chest x-ray could be explained by the GERD. (Id. at 504.) On examination, Plaintiff had a grossly normal gait. (Id. at 506.) His extremities appeared normal. (Id.) His breath sounds were equal and without wheezes, rales, or rhonchi. (Id.)

Plaintiff reported to Dr. Bailey on April 1 that his pain was again intermittent. (Id. at 414-16.) He was diagnosed with lumbago and right lower extremity radicular symptoms, and was given an injection. (Id. at 415-16.)

On April 25, Plaintiff reported that the injection had improved his pain by 25 percent and the medication by 10 percent. (Id. at 417-19.) A different location for the injection was tried, and his dosage of Neurontin was increased. (Id. at 418-19.)

Plaintiff saw Dr. Khan again on May 8. (Id. at 537-41.) A sleep study had demonstrated that his CPAP pressure needed to be retitrated and that Plaintiff had significant periodic limb movements (PLM) in sleep. (Id. at 538.) Plaintiff complained of a cough, dyspnea, orthopnea (shortness of breath when lying flat), sputum, and wheezing, but had normal breath sounds and no wheezes, rales or rhonchi on examination. (Id. at 539, 540.) He complained of swollen ankles, but on examination his extremities appeared normal and without any edema or cyanosis. (Id.) His gait was normal. (Id. at 539, 541.) He was oriented to time, place, person, and situation and had normal insight. (Id. at 541.) Plaintiff was encouraged to keep his CPAP machine on for longer. (Id. at 537.)

Plaintiff informed Dr. Bailey on May 9 that his medication had provided 50 percent relief and the injection had again provided 25 percent relief, but had caused him to be nauseous. (Id. at 420-23.) The quality of his pain had not changed, but its timing was "very variable." (Id. at 420.) He was given a right-sided L4-L5 and L5-S1 facet joint injection. (Id. at 421, 423.) He was prescribed tizanidine (a short-acting muscle relaxer) and was to wean off of Neurontin. (Id. at 421.) He was also given a prescription for physical therapy. (Id. at 422.)

The following month, on June 6, Plaintiff described his pain as constant and the injection as having provided 50 percent relief for approximately three days but also having caused headaches and nausea. (Id. at 424-25.) Plaintiff was to continue taking tizanidine, was encouraged to lose weight and exercise, and was to follow-up as needed. (Id. at 425.)

The following day, Plaintiff was seen at the University Hospital Orthopedic Institute for his complaints of ongoing chronic left shoulder pain for the past few years. (Id. at 475-80.) At rest, the pain was a one on a ten-point scale; with any lifting or reaching overhead, it was a

ten.  (Id. at 477.)  On examination, he was alert and oriented and in no distress.  (Id.)  He had

mild tenderness to palpation diffusely over his left shoulder and tenderness to palpation over

the acromioclavicular (AC) joint.  (Id. at 477-78.)  His active range of motion on forward

elevation was 100 degrees and was 20 degrees on external rotation.  (Id. at 478.)  X-rays of the

shoulder showed no acute fracture and were unremarkable.  (Id. at 480.)  He was to have

arthroscopic left shoulder surgery; a rotator cuff debridement and repair were anticipated.  (Id.

at 478.)

Plaintiff underwent arthroscopic surgery on July 5.  (Id. at 481-86.)

Plaintiff saw Krystle Miller, F.N.P., on July 16 for a refill of his medications.  (Id. at

550- 52.)  His hypertension and GERD were described as controlled; his degenerative disc

disease as symptomatic.  (Id. at 550.)  Ms. Miller reported that Plaintiff was scheduled to be

seen by a psychotherapist at the VA.  (Id.)  His examination results were normal.  (Id. at 552.)

Plaintiff was seen again on July 31 for a post-operative visit.  (Id. at 487-88.)  He

reported he was doing "pretty well" and having mild pain that was a three or four.  (Id. at 487.)

He was "asking about actually going swimming."  (Id.)  He did not have any pain on gentle

passive range of motion.  (Id.)  He was to progress on his range of motion and was not to lift

anything heavier than a couple of pounds.  (Id.)

Plaintiff returned to the Orthopedic Institute on August 23.  (Id. at 489-93.)  He had

back pain and bilateral lower extremity pain, greater on the left than on the right.  (Id. at 489-

93.)  The pain, a five to six on a ten-point scale, did not improve with any particular activity,

although it was lessened by a change of position.  (Id. at 490, 491.)  His current medications

included Advair, metoprolol, pantoprazole (used to treat GERD), tizanidine, venlafaxine (an

anti-depressant), Norco (a combination of acetaminophen and hydrocodone), Percocet, and albuterol.  (Id. at 490.)  On examination, his gait was normal, as was the motor strength in his lower extremities.  (Id. at 491.)  He could heel walk, toe walk, tandem walk, and stand on one leg without apparent difficulty.  (Id.)  He had a loss of lumbar lordosis and a diminished active range of motion in all planes.  (Id.)  There was mild lumbosacral tenderness without paraspinous muscle spasm.  (Id.)  X-rays of his lumbar spine revealed minor degenerative bony spurring at L3-L5 "without other arthritic, traumatic, destructive or other findings." (Id. at 491.)  He was diagnosed with back pain with bilateral lower extremity pain.  (Id.)  Plaintiff was to have a new MRI of his lumbar spine and was given a prescription for an escalating dose of gabapentin.  (Id. at 491-92.)

Five days later, Plaintiff had the MRI.  (Id. at 494-95.)

The next day, August 29, Joel J. Jeffries, M.D., reviewed the MRI and diagnosed Plaintiff with diffuse lumbar spondylosis.  (Id. at 496-97.)  Plaintiff described his back pain as an eight on a ten-point scale.  (Id. at 497.)  Dr. Jeffries opined that Plaintiff's best option was to avoid surgical intervention and continue with pain management and a home exercise program.  (Id.)  Plaintiff was to return as needed.  (Id.)

The same day Plaintiff was seen by Matthew Smith, M.D., for his left shoulder problem.  (Id. at 498-99.)  Plaintiff reported having pain that was an eight and requested a refill of his medication.  (Id. at 499.)  On examination, Plaintiff had some soreness and tenderness with abduction on external rotation.  (Id.)  His cuff strength was otherwise 5/5.  (Id.)  He was to proceed with home exercises and given a refill for Percocet.  (Id.)  He was to return in four weeks.  (Id.)

Plaintiff consulted Sanjay Ghosh, Ph.D., M.D., on October 16 about the pain in his lower and mid back, left shoulder, and neck and the numbness in his fingers and hand. (Id. at 574-81.) The pain was increased by exertion and alleviated by nothing. (Id. at 578.) Morning stiffness lasted thirty minutes. (Id.) Plaintiff was 6 feet 2 inches tall and weighed 351 pounds. (Id. at 579.) On examination, he was tender in the shoulders, cervical spine, and lumbar spine. (Id.) He was mildly tender and slightly swollen in his wrists and fingers. (Id.) Straight leg raises were negative. (Id.) Dr. Ghosh diagnosed Plaintiff with inflammatory arthritis, monitoring drug toxicity, lumbago, and fibromyalgia. (Id.) He was started on hydroxychloroquine for the arthritis, continued on gabapentin for the lumbago, and started on Savella for the fibromyalgia. (Id. at 579-80.) He was advised to see an ophthalmologist to prevent any consequences from the hydroxychloroquine and was to stop taking acetaminophen-codeine. (Id. at 580.)

On October 30, Dr. Smith noted that Plaintiff was generally doing okay and progressing. (Id. at 500-01.) Plaintiff complained of pain with range of motion. (Id. at 500.) Dr. Smith opined that Plaintiff would benefit from a corticosteroid injection. (Id.)

Plaintiff returned to Dr. Ghosh on November 20, complaining of moderate dull low back pain radiating to both legs; the pain was increased by bending and stooping and decreased by pain medication. (Id. at 582-84.) His hands and other joints were fine. (Id. at 582.) Plaintiff was continued on the hydroxychloroquine and the Savella and was given oxycodone-acetaminophen for his pain. (Id. at 583-84.)

Three days later, Plaintiff was seen in the emergency room for symptoms of a respiratory infection beginning the day before and worsening during the night. (Id. at 449-73.)

On examination, he was not anxious or depressed and was oriented to time, place, and person. (Id. at 450.) He moved his extremities well, but did have chronic numbness and tingling in his extremities. (Id.) Chest x-rays and a CT scan were unremarkable. (Id. at 449, 464-65.) After being given a breathing treatment with oxygen, Plaintiff continued wheezing. (Id. at 449.) He was started on a course of medications and had stabilized by the next day. (Id. at 452.) His shortness of breath was resolved, his cough and wheezing were almost resolved. (Id.) The chronic back pain was stable and controlled. (Id.) On discharge, Plaintiff was diagnosed with COPD exacerbation, stable hypertension, obstructive sleep apnea, stable chronic pain and lumbago, stable neuropathy, and obesity. (Id. at 452.) He was given prescriptions for prednisone, levaquin (an antibiotic), and albuterol. (Id. at 452.)

On November 30, Plaintiff followed up from his emergency room visit with Dr. Tiefenbrunn. (Id. at 554-58.) Plaintiff reported that he still had shortness of breath and tightness in his chest, but was doing better with his breathing. (Id. at 554.) He was diagnosed with improved simple chronic bronchitis, controlled obstructive sleep apnea, controlled GERD, fairly controlled myalgia and myositis, and worsening unspecified episodic mood disorder. (Id.) His medications were continued, and he was prescribed Lamictal to be taken daily to stabilize his mood. (Id.)

Six days later, Plaintiff had a follow-up visit with Dr. Khan about his snoring and the exacerbation of his COPD. (Id. at 531-36.) Plaintiff reported struggling to keep his CPAP mask on for four hours or more. (Id. at 533.) It was getting easier as he was getting use to the

increased pressure. (Id.) He also complained of orthopnea, PND,[5] and occasional ankle swelling. (Id.) On examination, he had a normal heart rate, rhythm, and sounds; normal breath sounds and effort; and a normal range of motion in his neck. (Id. at 535.) He was encouraged to keep the CPAP mask on for four hours or longer each night. (Id. at 536.) He was given a vaccination against pneumococcal disease. (Id.)

On January 14, 2013, Plaintiff had a check-up with Dr. Tiefenbrunn for his hyperlipidemia and hypertension. (Id. at 559-64.) Plaintiff reported that the Lamictal had "made him less edgy." (Id. at 559.) He was yelling less and getting upset less. (Id.) Plaintiff's dosage of metoprolol was increased; diet, weight loss, and exercise were encouraged. (Id.)

Two days later, Plaintiff underwent pulmonary function tests. (Id. at 516-20.) They showed mild obstruction without response to bronchodilators and mild restriction. Also, Plaintiff demonstrated features of variable extrathoracic obstruction. (Id.) An ear, nose, and throat (ENT) consultation was to be considered. (Id. at 517.)

Six days later, Plaintiff met with Dr. Khan to follow-up on a CPAP titration study and to discuss the results of his pulmonary function tests. (Id. at 526-31.) His diagnoses included obstructive sleep apnea, GERD, tobacco dependence in remission, morbid obesity, and unspecified chronic bronchitis. (Id. at 526.) Dr. Khan noted that Plaintiff had restless leg syndrome, which was controlled on gabapentin. (Id. at 527.) He reported that he was tolerating the new pressure of his CPAP machine well and was awaking up more refreshed. (Id.) Dr. Khan further noted that the results on the pulmonary function six-minute walk test were 75

---

[5]There is no indication in the record of what "PND" stands for, nor does a review of medical abbreviations resolve the question.

percent of that predicted. (Id.) On examination, Plaintiff was alert and oriented to time, place, and person and had a normal mood and affect. (Id. at 530.) His behavior was normal. (Id.) He had a normal range of motion in his neck and normal breath sounds. (Id.) He was encouraged to keep the CPAP mask on for a longer period; was to continue using Advair and albuterol, as needed; was encouraged to lose weight; and was instructed on anti-reflux measures, including taking Zantac. (Id. at 530-31.) It was noted that he had lost ten pounds since May 2012. (Id. at 531.)

Plaintiff was seen by Dr. Ghosh on February 13 for his moderate low back pain that radiated to his right leg, was increased by bending and stooping, and was decreased by nothing. (Id. at 587-90.) On examination, Plaintiff had a regular heart rate and rhythm and normal breathing. (Id. at 589.) He had no tenderness or swelling in his shoulders, wrists, or elbows. (Id.) He was tender in his lumbar spine, but not in his cervical or thoracic spine. (Id.) He was diagnosed with sciatica, inflammatory arthritis, vitamin D deficiency, monitoring drug toxicity, and fibromyalgia. (Id.) He was given an epidural steroid injection in his lumbar spine and continued on his current medications, including vitamin D3. (Id. at 589-90.)

On March 13, Plaintiff reported to Dr. Ghosh that the injection had helped for ten days. (Id. at 591-93.) On examination, he was as before. (Id. at 592.) His dosage of oxycodone-acetaminophen was increased. (Id.) His other medications were continued, and weight management was discussed. (Id. at 592-93.) He was to return in four weeks. (Id. at 593.)

Plaintiff had the same complaints and diagnoses when seeing Dr. Ghosh on April 10. (Id. at 594-96.) His oxycodone-acetaminophen was increased. (Id. at 596.) He was continued

on Savella as his fibromyalgia was better.  (Id.)   He was to return in eight to twelve weeks. (Id.)

In June, Plaintiff had an EMG with nerve conduction of his upper and lower extremities. (Id. at 627-28.)  The former's findings were consistent with a recurrence of his bilateral carpal tunnel syndrome and the latter's were consistent with the possibility of early peripheral neuropathy.  (Id.)

On July 3, Plaintiff saw Dr. Ghosh for his complaints of moderate dull neck pain radiating to both arms and low back pain radiating to his right let.  (Id. at 597-600.)  Also, his left shoulder hurt.  (Id. at 597.)  On examination, he had no tenderness or swelling in his shoulder, elbows, wrists, or ankles.  (Id. at 599.)  He was tender in his cervical and lumbar spine.  (Id.)  His prescription for oxycodone-acetaminophen was refilled and he was started on methotrexate (used to treat rheumatoid arthritis).  (Id.)  He was to follow up in four weeks.  (Id. at 600.)  Also, he was to have an MRI of his cervical spine and of his lumbar spine and be seen by a back surgeon.  (Id. at 599.)

The MRI of his cervical spine showed a post-operative C5-C6 fusion with left lateralized disc herniation at C4-C5 and right paracentral disc herniation at C6-C7; severe C4-C5 central canal stenosis, greater on the left than the right at C4-C5; mild to moderate right C6-C7 neural foraminal exit stenosis; moderate C6-C7 central canal stenosis; and broad-based spur/disc complex C3-C4 results in mild central canal stenosis and mild to moderate bilateral neural foraminal exit stenosis.  (Id. at 602.)  The MRI of his lumbar spine showed facet arthropathy with a synovial cyst; hypertrophy of the ligamentum flavum; broad-based disc bulge

and end plate spurring at L4-L5; and broad-based disc bulge, central protrusion, and mild facet arthropathy at L5-S1.  (Id. at 603.)

Also before the ALJ were assessments of Plaintiff's physical and mental residual functional capacities.

In February 2012, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Marsha Toll, Psy.D.  (Id. at 399-409.)  The period under review was September 5, 2011, to September 5, 2012.  (Id. at 399.)  Plaintiff was assessed as having an affective disorder, i.e., an unspecified episodic mood disorder.  (Id. at 399, 402.)  This disorder resulted in mild restrictions in his daily living activities, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  (Id. at 407.)  They did not cause any repeated episodes of decompensation of extended duration.  (Id.)

That same month, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by Stephanie Riley, a single decision-maker.[6]  (Id. at 66-800.)  The primary diagnosis was cervical spondylosis/failed neck syndrome; the secondary diagnoses were lumbar spine degenerative disc disease and carpal tunnel syndrome; and other alleged impairments included gastroesophageal reflux disease (GERD), sleep apnea, and breathing problems.  (Id. at 66.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and, stand,

---

[6]See 20 C.F.R. § 404.906 (defining role of single decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

walk, or sit for approximately six hours in an eight-hour day.  (Id. at 67.)  His ability to push

or pull was otherwise unlimited.  (Id.)  He had postural limitations of never climbing ladders,

ropes or scaffolds and only occasionally balancing, stooping, kneeling, crawling, crouching,

and climbing ramps and stairs.  (Id. at 68.)  He had one manipulative limitation, i.e., he was

limited in his ability to reach in all directions, including overhead.  (Id. at 69.)  He had

environmental limitations of needing to avoid concentrated exposure to fumes and other

airborne irritants, extreme cold or heat, and hazards.  (Id. at 70.)  He had no visual or

communicative limitations.  (Id. at 69.)

And, in November 2011, Plaintiff was approved for Medicaid.  (Id. at 182-84.)  Dr.

Richard Secor had completed a Medical Report Including Physician's Certification/Disability

Evaluation.  (Id. at 333-34.)  Dr. Secor's specialty was family practice; he had not treated

Plaintiff in the past year.  (Id. at 333.)  Plaintiff's diagnoses included back pain, hypertension,

and recent cervical fusion.  (Id.)  He was reported to have a decreased range of motion in his

cervical spine with a poor ability to bend or stoop.  (Id. at 334.)  His functional capacity was

severely limited due to multilevel discogenic disease.  (Id.)

Dr. Secor issued another such Report in February 2013, listing Plaintiff's medical

history as including glaucoma, COPD, a C5-C6 fusion, left rotation cuff and bicep surgery,

GERD, carpal tunnel, sleep apnea, fibromyalgia, sciatica, hypertension, hyperlipidemia, and

pending neck fusion.  (Id. at 572.)  Dr. Secor marked that he had treated Plaintiff during the past

year.  (Id.)  Plaintiff's incapacity was permanent.  (Id. at 573.)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through December 31, 2016, and has not engaged in substantial gainful activity since his alleged disability onset date.  (Id. at 13.)

She next found that he had severe impairments of "status-post left rotator cuff surgery, lumbar degenerative disc disease (DDD), cervical spinal stenosis, spondylosis, stenosis, and compression, and failed neck surgery syndrome."[7]  (Id.)  His unspecific episodic mood disorder did not cause more than minimal limitations in his ability to work and was not, therefore, severe.  (Id.)  When assessing Plaintiff's mental impairment, the ALJ determined he had no worse than mild limitations in his activities of daily living, social functioning, and concentration, persistence, and pace.  (Id. at 14.)  He had not had any episodes of decompensation of extended duration.  (Id.)

His impairments, singly or combined, did not meet or medically equal an impairment of listing-level severity.  (Id. at 15.)

The ALJ then determined that Plaintiff has the residual functional capacity (RFC) to perform light work with additional limitations of avoiding climbing ropes, ladders, and scaffolding; avoiding fumes, odors, gases, dust, and hazardous heights; and only occasionally pushing or pulling with his left upper extremity.  (Id.)  When assessing Plaintiff's RFC, the ALJ also evaluated his credibility, and found him not entirely credible.  (Id. at 15-17, 20.)  She

---

[7]Failed neck surgery syndrome is a "term[] used to describe pain that starts or persists after a . . . neck procedure."  Plas T. James, M.D. Failed Back and Neck Surgery Syndromes, http://atlantaspineinstitute.com/spinal-treatment-options/failed-back-and-neck-surgery-syndrome (last visited Nov. 5, 2015).

determined that the objective medical evidence supported no greater a restriction than the pushing or pulling limitation. (Id. at 16.) His testimony about the length of time he can stand or walk was inconsistent with the repeated observations that his gait was normal and without evidence of incoordination. (Id.) His testimony about how long he can sit was inconsistent with his ability to sit during the 70-minute hearing without any problems. (Id. at 16-17.) His complaints to Dr. Bailey of continuing neck pain after his September 2011 surgery were not credible because he had attended only three, or 25 percent, of the prescribed physical therapy sessions. (Id. at 17.)

The ALJ then addressed Plaintiff's nonsevere, physical impairments. (Id. at 17-19.) His obesity did not, alone or in combination with other impairments, significantly limit his ability to do basic work activities. (Id. at 18.) His hypertension and GERD were controlled with medication. (Id.) His mild left ventricular hypertrophy did not cause more than minimal functional limitations. (Id.) His sleep apnea was controlled by the use of the CPAP machine and had not precluded him from engaging in substantial gainful activity subsequent to his diagnosis. (Id.) There had been but one exacerbation of his COPD, and his breathing was regularly normal and controlled with medication. (Id.) His activities, including working outdoors, were inconsistent with his complaints of disabling carpal tunnel problems. (Id.) Although Dr. Ghosh had diagnosed Plaintiff with fibromyalgia, the diagnosis was not supported by the required medical evidence and was inconsistent with the rest of the record. (Id. at 19.)

Also when assessing Plaintiff's RFC, the ALJ gave great weight to the opinion of Dr. Youkilis on how much weight Plaintiff can lift and how much overhead work he can perform.

(Id.)  She gave little weight to the opinions of Dr. Secor as he had not treated Plaintiff in the past year, was not a specialist, and rendered an opinion that was reserved to the Commissioner. (Id. at 19-20.)

With his RFC, Plaintiff is not able to return to past relevant work.  (Id. at 20.)  With his RFC, age, and education, he can perform jobs that exist in the national economy, e.g., the three jobs described by the VE.  (Id. at 20-21.)

The ALJ concluded that Plaintiff is not disabled within the meaning of the Act.  (Id. at 21.)

## Additional Records Before the Appeals Council

After the ALJ's adverse decision, Plaintiff submitted to the Appeals Council additional medical records, beginning with the August 13, 2013, records of Dr. Jeffries when Plaintiff saw him for a follow-up for his back pain; information on the MRI results, see page 23, supra; complaints of low back pain radiating into his right lower extremity; neck pain; and "progressively increasing shock-like symptoms in his body when he coughs or sneezes."  (Id. at 631-35.)  There were no issues with his gait.  (Id. at 631, 632.)  He had a mildly diminished cervical range of motion and Spurling's maneuver caused neck pain.  (Id. at 632.)  He had normal muscle strength in his upper and lower extremities.  (Id.)  He had pain in his right leg, but not his left.  (Id.)  X-rays of his cervical spine showed anterior cervical disc fusion changes at C5-C6 and multilevel mild spondylotic changes.  (Id. at 634.)  X-rays of his lumbar spine showed anterolisthesis of L4 on L5, likely related to degenerative facet changes, and multilevel mild spondylotic changes without any significant abnormal translation with flexion and extension.  (Id. at 635.)  Dr. Jeffries' impression was of cervical spinal stenosis and

degenerative spondylolisthesis with facet cyst at L4-L5.  (Id. at 632.)  He recommended a cervical myelogram.  (Id.)

Ten days later, Plaintiff consulted Theodore John Choma, M.D., also with the University of Missouri Health Care System, for a surgical evaluation.  Dr. Choma recommended a surgical decompression in the form of a C4 corpectomy, C3-C5 anterior cervical fusion, and the removal of the C5-C6 plate.  (Id. at 636-38.)

Plaintiff underwent surgery on September 19.  (Id. at 644-72.)  His preoperative and postoperative diagnoses were cervical spondylotic myelopathy.  (Id. at 646.)  Plaintiff was discharged two days later.  (Id. at 660.)

At a October 30, post-operative visit to Dr. Choma, Plaintiff complained of grinding and pain in his neck whenever he coughed or sneezed.  (Id. at 729-46.)  X-rays of his cervical spine showed no significant change since the post-operative x-rays taken the previous month.  (Id. at 731.)  A cervical 3 through cervical 5 posterior spinal fusion and instrumentation was to be performed.  (Id. at 732.)

Dr. Choma's notes of November 12 report that Plaintiff had mechanical pain from the earlier operation.  (Id. at 675-700, 703-28.)  He was diagnosed with cervical instability with loss of fixation, cervical kyphosis, and cervical spondylosis.  (Id. at 677.)  He underwent a C3-C5 posterior spinal fusion, C3-C5 posterior segmental instrumentation, and placement of nonstructural allograft and local autocgraft bone for spinal fusion.  (Id. at 676.)        Plaintiff informed Dr. Choma at a December 18 postoperative visit that it had been tougher for him to recover from the recent surgery than from the previous one.  (Id. at 747-49.)  X-rays revealed

that his implants were in appropriate alignment.  (Id. at 748.)  He was taking Percocet and had switched from gabapentin to Lyrica.  (Id. at 747.)  His fingers were numb.  (Id.)

In February 2014, Plaintiff described his pain to Dr. Choma as being a seven out of ten.  (Id. at 750-53.)  He was still taking Percocet and Lyrica.  (Id. at 750.)  X-rays of his cervical spine showed stable anterior C3-C6 and posterior C3-C5 fusions with equivocal loosening of the C5 posterior screws.  (Id. at 753.)  He was prescribed hydroxyzine, meperidine (used for the short-term treatment of moderate to severe pain), and promethazine; his prescription for Percocet was renewed.  (Id. at 750-51.)  He was to continue his weight lifting and activity restrictions and was to return in three months.  (Id. at 752.)

Plaintiff informed Dr. Choma in May that he was doing reasonably well and wanted to get more active, e.g., mow the grass and do home projects.  (Id. at 754-56.)  On the rare occasions when he was physically active, he had some neck pain and tingling in the left arm.  (Id. at 754.)  He would then stop and rest until the symptoms resolved.  (Id.)  On examination, he appeared well, had an erect stance, and had a normal gait.  (Id. at 755.)  He was released to gradually resume some home activities but was not to operate heavy machinery for at least one year and not to permanently not lift more than forty pounds.  (Id. at 755.)  He was to return in one year.  (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).  Not only the

impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'"  **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010).  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits.

**Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "'[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Id.** (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011). "'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The

Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).

### Discussion

Plaintiff argues that the ALJ erred in (a) assessing his RFC; (b) not finding his carpal tunnel syndrome to be a severe impairment; and (c) assessing his credibility.

Plaintiff focuses his challenge to the ALJ's RFC determination on the underlying decision of the ALJ to give "great weight" to Dr. Youkilis' opinion and "little weight" to Dr. Secor's. (R. at 19.) As noted by the ALJ, Dr. Youkilis released Plaintiff to return to work with a twenty-pound lifting restriction and minimal overhead reaching. These restrictions were included in her RFC determination. As noted by the Commissioner, more weight is given to

the opinion of a specialist than to a treating source, see 20 C.F.R. §§ 404.1527(d)(5) and 416.927(d)(5), and it is the duty of the ALJ "to resolve conflicts among 'the various treating and examining physicians," **Bentley v. Shalala**, 52 F.3d 784, 785 (8th Cir. 1995) (quoting <u>Cabrnoch v. Bowen</u>, 881 F.2d 561, 564 (8th Cir. 1989)).

Two months before his alleged disability onset date, Plaintiff consulted Dr. Youkilis about his neck pain and bilateral weakness and tingling in his upper extremity. At that time, his gait was steady and he had full strength in his upper extremities. Eight days after Plaintiff's alleged disability onset date, Dr. Youkilis performed an anterior cervical discectomy and fusion. The next month, Dr. Youkilis saw Plaintiff and issued the lifting and reaching restrictions. The ALJ accorded those restrictions great weight on the grounds that they were "supported by and consistent with the evidence." (R. at 19.) <u>See</u> 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (listing "[s]upportability" as a factor to be considered when weighing medical opinions). The Court disagrees.

Dr. Youkilis saw Plaintiff three times: once before his surgery, at the surgery, and once after the surgery. This last visit occurred the month following Plaintiff's alleged disability onset date and twenty-three months before the adverse decision. Later the same month as Plaintiff's last visit to Dr. Youkilis, he complained to Dr. Tiefenbrunn that his neck pain had increased since the operation. Two months later, he complained to Dr. Bailey, a pain specialist, about the pain. Dr. Bailey diagnosed him with failed neck surgery syndrome. Plaintiff also complained to Dr. Ghosh about his neck pain. Although Plaintiff did not complain about neck pain at every visit to Dr. Bailey or Dr. Ghosh, the pain was a recurring issue. For instance, when seen by Dr. Bailey in January 2012, Plaintiff's dosage of Neurontin was increased due to his

neck pain.  Plaintiff complained of neck pain to Dr. Ghosh in October 2012; when seen by Dr. Ghosh in February 2013, Plaintiff was not tender at his cervical spine; five months later, he was. Plaintiff was consistently prescribed strong pain medication.  Cf. **Ostronski v. Chater**, 94 F.3d 413, 419 (8th Cir. 1996) (lack of strong pain medication "does not suggest a disabling degree of pain").  Also, the ALJ's finding that Plaintiff had a severe impairment of failed neck surgery syndrome is based on a diagnosis made *after* Dr. Youkilis stopped seeing Plaintiff.  The ALJ noted that Plaintiff's gait was routinely described as normal; however, Dr. Youkilis also described it as such the month before operating on Plaintiff, suggesting that a normal gait does not negate neck pain.  And, the ALJ incorrectly concluded that Plaintiff had had only three physical therapy visits, or 25 percent of the prescribed number.  Instead, he had 85 percent, or eleven of thirteen visits and had been doing his home exercise program.  Cf. **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010) ("'[A] claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight.'") (quoting Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008)) (alteration in original).

The ALJ found that Dr. Youkilis as Plaintiff's treating surgeon was "very familiar with [Plaintiff's] impairments and how they limit his functioning."  (R. at 19.)  The length of the treating relationship and the frequency of examination are factors to consider when weighing medical opinions.  See 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).  Dr. Youkilis' treatment relationship with Plaintiff does not support the ALJ's characterization of that relationship.  Drs. Bailey and Ghosh treated Plaintiff more frequently and for longer than did Dr. Youkilis.  Albeit, neither placed any restrictions on Plaintiff, at the time they treated him he was not working or

engaging in any activity that arguably needed to be limited. A medical opinion is not to be given great weight simply because there is no opposing or more restrictive opinion in the record.

The Commissioner argues that giving "great weight" to Dr. Youkilis' opinion does not equate with giving the opinion "total weight." The Court agrees. See **Papesh v. Colvin**, 786 F.3d 1126, 1132 (8th Cir. 2015) (distinguishing between giving a physician's opinion controlling weight and giving it substantial weight). The adjective "great" is defined as "[o]f a size, bulk, or extent that is considerably above average." Oxford English Dictionary, http://www.oed.com/view/Entry/81104 (last visited Nov. 5, 2015). The ALJ's decision to give Dr. Youkilis' great weight is unsupported by the record.

Plaintiff argues that the ALJ's decision to give Dr. Secor's opinion little weight is also unsupported by the record. It is not. The only evidence that Dr. Secor ever saw Plaintiff was his checkmark on the box of the second report that he had treated Plaintiff in the past year. There were, however, no treatment records of Dr. Secor before the ALJ or the Appeals Council. Three months earlier, Dr. Secor marked that he had *not* treated Plaintiff in the past year. A treating physician's opinion "may have 'limited weight if it provides conclusory statements only, or is inconsistent with the record.'" **Papesh**, 786 F.3d at 1132 (quoting Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007)). Dr. Secor's two opinions are conclusory and were properly discounted as such.

Because the ALJ erred in her decision to give Dr. Youkilis' opinion great weight and gave weight to a purported failure to attend all but two physical therapy sessions based on a misreading of the record, the case will be remanded for further evaluation of Plaintiff's neck pain and any resulting functional limitations.

Plaintiff also argues that the ALJ erred in evaluating his credibility.

Insofar as he contends that the ALJ should have discussed all the *Polaski* factors, his argument is unavailing. When rejecting a claimant's testimony, "'the ALJ must make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the <u>Polaski</u> factors,'" **Renstrom v. Astrue**, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting <u>Dipple v. Astrue</u>, 601 F.3d 833, 837 (8th Cir. 2010)), although the ALJ "'need not explicitly discuss each <u>Polaski</u> factor,'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting <u>Goff</u>, 421 F.3d at 791).

Plaintiff contends that the ALJ erred by considering his demeanor at the hearing and his ability to rise from his chair and walk out of the room without apparent difficulty when assessing his credibility. As noted by the ALJ, Plaintiff testified that he cannot sit for longer than ten minutes before having to change positions. Although a claimant's "failure to 'sit and squirm' with pain during the hearing cannot be *dispositive* of his credibility." **Muncy v. Apfel**, 247 F.3d 728, 736 (8th Cir. 2001) (emphasis added), "[t]he ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations," **Johnson v. Apfel**, 240 F.3d 1145, 1147-48 (8th Cir. 2001).

When assessing Plaintiff's credibility, the ALJ further considered his attendance at physical therapy sessions. As the ALJ's conclusion about the frequency of that attendance is in error, Plaintiff's credibility is to be reassessed on remand insofar as it was informed by that error.

Plaintiff contends that the ALJ erred by not finding his carpal tunnel syndrome to be a severe impairment. Plaintiff alleged a disability onset date of September 2011. Five months

prior, his carpal tunnel syndrome was described as reappearing. Four months prior, it was described as moderate. In October 2011, he had a negative Tinel's sign. Twenty-one months after his disability onset date, Plaintiff's carpal tunnel syndrome was again described, but only as recurring. Thus, Plaintiff's carpal tunnel syndrome had reappeared before Plaintiff had stopped working. And, consistently in subsequent examinations Plaintiff was found to have normal muscle strength, a normal hand grip, and no swelling in his upper extremities. See 20 C.F.R. §§ 404.1520(c), 416.920(c) (each describing a "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . .").

The only evidence that Plaintiff's carpal tunnel syndrome is severe is his testimony describing an inability to do such things a hold a cup or use a keyboard and his report of difficulties with buttons. As Plaintiff's credibility is to be reassessed on remand insofar as the error about his attendance at physical therapy sessions was a consideration in its evaluation, the characterization of his carpal tunnel syndrome as not being severe should also be reconsidered if Plaintiff is found to be credible.

### Conclusion

Where an ALJ fails to properly consider opinion evidence of record, it cannot be said that the resulting RFC determination is supported by substantial evidence on the record as a whole. **Holmstrom v. Massanari**, 270 F.3d 715, 722 (8th Cir. 2001). In the instant case, the ALJ failed to properly evaluate Dr. Youkilis' opinion and misstated the record when evaluating that opinion and Plaintiff's credibility. The matter will therefore be remanded for further consideration.

Although the Court is aware that the ALJ's decision as to non-disability may not change after properly considering all the evidence of record and undergoing the required analysis, <u>see</u> **Pfitzer v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999), the determination is nevertheless one that the Commissioner must make in the first instance.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and that this case is REMANDED to the Commissioner for further proceedings as discussed above.

An Order of Remand shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  9th  day of November, 2015.